AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) Case No.     2:23-mj-0121 CKD |
|  | ) |
| JEREMY MICHAEL BENNER | ) |
|  | ) |
|  | ) |
| *Defendant(s)* | |

**FILED**
**Aug 28, 2023**
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 13, 2023 _____ in the county of _____ Solano _____ in the _____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a Firearm |

This criminal complaint is based on these facts:

See Affidavit of FBI Special Agent Nathan Cernat, attached hereto and incorporated by reference.

☒   Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Nathan Cernat, FBI Special Agent
*Printed name and title*

Sworn to me and signed via telephone.

Date:    August 28, 2023 at 1:30 pm

_____
*Judge's signature*

City and state:    Sacramento, CA

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

**CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     AGENT BACKGROUND ......................................................................................1

III.    PROBABLE CAUSE..............................................................................................3

        September 13, 2022 Controlled Buy of Two Ounces of Cocaine from
               BENNER.............................................................................................3

        September 27, 2022 Controlled Buy of 1,000 MDMA Pills from BENNER....4

        October 18, 2022 Controlled Buy of 2,000 MDMA Pills from BENNER
               (Supplied by J.S.).............................................................................5

        February 13, 2023 Buy of 2,000 MDMA Pills from BENNER (Supplied by
               ANTONIO WARREN)......................................................................8

        March 8, 2023 Controlled Buy of Ten Ounces of Cocaine from BENNER
               (Supplied by A.C.) and a Ruger Firearm ...........................................11

        April 20, 2023 Controlled buy of 2,000 MDMA pills and a firearm from
               BENNER and WARREN ..................................................................13

        April 28, 2023 Controlled buy of an AR-15 Rifle from BENNER .................14

        July 13, 2023 Controlled Buy of a Ruger LCR Revolver from BENNER ......16

        August 9, 2023 Controlled Buy of 2,000 MDMA Pills from BENNER and
               WARREN ..........................................................................................17

        BENNER is a Prohibited Person under § 922(g)(1) .......................................19

        Interstate Nexus ..............................................................................................19

        Training and Experience Regarding Drug/Firearm Trafficking and
               Drug/Firearms Traffickers ................................................................19

        Training and Experience Regarding Computers, Electronic Storage, And
               Forensic Analysis..............................................................................22

IV.     REQUEST FOR SEALING...................................................................................26

V.      CONCLUSION......................................................................................................28

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE AND UNDER RULE 4 FOR A WARRANT TO ARREST**

## I.    INTRODUCTION

I, Nathan Cernat, being first duly sworn, hereby depose and state as follows:

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property:

| Attachment | Target Person / Residence / Vehicle |
| --- | --- |
| A-1 | JEREMY MICHAEL BENNER ("**BENNER**") |
| A-2 | ANTONIO MARKETH WARREN ("**WARREN**") |
| A-3 | 1926 Griffin Dr., Vallejo, CA 94589 **("WARREN's RESIDENCE")** |
| A-4 | A 2001 White Lexus, bearing the California License Plate 4UNW083 ("**BENNER's LEXUS**") |
| A-5 | A 2002 Gray Honda, bearing the California License Plate 8RXZ319 ("**WARREN's HONDA**") |
| A-6 | A 2021 Silver Toyota, bearing the California License Plate 8WOD012 (**WARREN's TOYOTA**) |

2.    These people and property are further described in Attachments A-1 through A-6.  The applications seek to search them for the things described in Attachment B-1 through B-6.  This affidavit also supports my application for a complaint and an arrest warrant of BENNER for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 (conspiracy to distribute and possess with intent to distribute controlled and/or counterfeit substances) have been committed by JEREMY MICHAEL BENNER (BENNER), ANTONIO MARKETH WARREN (WARREN) and A.C.  In addition, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) – felon in possession of firearms or ammunition, and 18 U.S.C. § 922(a)(1)(A) – illegal firearms trafficking have been committed by BENNER.  Collectively the violations described above will be referred to as the "TARGET OFFENSES."

## II.    AGENT BACKGROUND

3.    I am a Special Agent of the United States Department of Justice, Federal Bureau of

AFFIDAVIT

1

Investigation (the "FBI").  I have been an FBI Special Agent since April 2015.   As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am currently assigned to the FBI's Sacramento Division, Fairfield Resident Agency, where I work as part of the FBI's Solano County Violent Crime Task Force.  In this role, I am responsible for investigating a variety of criminal matters, to include violent criminal enterprises such as street gangs and organized crime.

4.    I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia.  During my training, I received training in Title 21 of the United States Code, including Sections 841(a)(1) and 846.  During my employment as an FBI Special Agent, I have participated in numerous criminal investigations.  I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances and weapons.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including informants and cooperating sources), pen register and trap and trace devices, telephone tracking devices, mail covers, pole cameras, stationary video recording vehicles, wire intercepts, audio and audio/video recording devices.

5.    Through my training, experience, and interaction with other experienced Special Agents, Task Force Agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs, to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives.  I know that narcotics trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection.  For instance, I know that members of narcotics trafficking organizations routinely utilize electronic communications facilities, including cellular telephones and mobile messaging applications such as Snapchat or Instagram to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members; that organization members routinely use coded references in an effort to avoid law enforcement detection; and

AFFIDAVIT

2

that the communication of time-sensitive information is critical to the successful conduct of these organizations' illegal activities.

6.    I am aware, from training and experience, that individuals engaged in drug trafficking commonly use coded language to refer to drugs and drug transactions. Drug traffickers specifically use coded language in an effort to evade law enforcement by seemingly concealing the true nature of their discussions and actions.

7.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to demonstrate that there is probable cause for the requested complaint and warrants. It does not set forth all of my knowledge about this investigation.

### III.    PROBABLE CAUSE

*September 13, 2022 Controlled Buy of Two Ounces of Cocaine from BENNER*

8.    On September 13, 2022, an FBI Confidential Human Source ("CHS")[1] purchased approximately two ounces of cocaine HCL from **BENNER** for $2,000. Prior to this controlled drug deal, the CHS coordinated with **BENNER** via Snapchat messages regarding the specifics of the transaction to include the time and meeting location, as well as the quantity and price of the narcotics. This controlled drug deal (and all other drug deals detailed below) followed the same procedures: they were surveilled by undercover law enforcement, the controlled buy was surreptitiously recorded, and the CHS's vehicle and person were searched by law enforcement for contraband both before and after the deal.

9.    On September 13, the CHS met **BENNER** at the Walmart located at 235 E. Dorset Drive in Dixon, California. Before to the drug deal, the CHS messaged **BENNER** at the Snapchat account with username sparkone83 (BENNER's Snapchat Account) to coordinate the quantity of cocaine, the price, and meeting location. Before their meeting, **BENNER** messaged the CHS from BENNER's Snapchat Account stating that he was on his way and had to pick up the cocaine while en-route. **BENNER** arrived

---

[1] The CHS is cooperating with the FBI for potential consideration on possible federal or state charges. The CHS has no criminal convictions. The CHS has been arrested, but not convicted, for the following offenses: possession of a concealed firearm in a vehicle. The CHS has been an informant for the FBI since August 2022 and has been proven to be a reliable CHS thus far. The CHS' reporting has been proven to be truthful and has been independently verified by FBI agents.

AFFIDAVIT

3

at the meeting location with the CHS in a black and silver Infiniti, bearing the California License Plate 9BXE250 (BENNER's Infiniti) and parked directly next to the CHS.  I reviewed the covert recording, which revealed that the two talked about cars and guns for several minutes.  Surveilling agents did not observe the exchange of cocaine for money between **BENNER** and the CHS because the two were standing between their two cars and out of view of the surveillance team.  After completing the drug deal, **BENNER** left the parking lot and drove eastbound on Interstate 80 towards Sacramento.  FBI surveillance units followed **BENNER**, but lost sight of him in heavy traffic for about 20 minutes.  As the surveillance team arrived in the area of **BENNER's** listed DMV address, 5108 Thurman way in Sacramento (BENNER's Former Residence),[2] FBI surveillance units observed **BENNER** park directly in front of his residence and then entering the residence.

10.     The CHS left the meeting location in Dixon under continuous surveillance.  The CHS met with agents and task force officers after the controlled purchase operation at a predetermined location and turned over the package that **BENNER** had given the CHS.  The suspected cocaine weighed approximately 88 grams in the original packaging.  The United States Department of Justice Western Laboratory analyzed the suspected cocaine sold by **BENNER** on September 27, 2022.  The Western Laboratory confirmed the substance was Cocaine Hydrochloride with a purity of approximately 88% and with a net weight of approximately 55.9 grams.

11.     After the September 13, 2022 drug deal, **BENNER** discussed future deals and pricing with the CHS using BENNER's Snapchat Account.  **BENNER** stated that if CHS purchased more than four ounces of cocaine at a time, the price would drop to $950 per ounce.  **BENNER** also offered, for sale, a "quarter kick" of cocaine, which he said was nine ounces.

### *September 27, 2022 Controlled Buy of 1,000 MDMA Pills from BENNER*

12.     On September 27, 2022, the CHS purchased approximately one thousand MDMA (methylenedioxymethamphetamine) pills from **BENNER** for $1,500.  Prior to the drug deal, the CHS and **BENNER** coordinated the specifics of the transaction to include the time and meeting location, as well as the quantity and price of the narcotics via Snapchat messages.

---

[2] BENNER has recently relocated to San Diego, CA.

AFFIDAVIT

13.    On this same day, the CHS met **BENNER** in the parking lot of Scandia Family Center, located at 4300 Central Pl, Fairfield, CA 94534, California.  Before the meeting, **BENNER** used his Snapchat Account to coordinate the quantity of drugs, the price, and the meeting location.  While coordinating the details of the transaction via Snapchat, the Snapchat call between **BENNER** and the CHS kept failing due to lack of cellular reception.  **BENNER** then provided the CHS the phone number 707-812-5764 ("BENNER's Phone") via a Snapchat message and asked the CHS to call him (**BENNER**) over that phone number.  The CHS called BENNER's Phone.  According to the CHS, during the conversation, **BENNER** confirmed the transaction and agreed to the time and location of the meeting.

14.    FBI surveillance units observed **BENNER** arriving at the meeting location in BENNER's Infiniti and parking next to the CHS.  A surreptitious video recording captured **BENNER** retrieving the drugs from a blue bag and placing the drugs on the floorboard of the CHS' vehicle.  After completing the drug deal, **BENNER** left the parking lot and drove eastbound on Interstate 80 towards Sacramento.

15.    The CHS left the meeting location in Fairfield under continuous surveillance.  The CHS met with agents and task force officers after the controlled purchase operation at a predetermined location and turned over the package that **BENNER** had given the CHS.  The suspected drugs weighed approximately 360 grams in the original packaging.  The United States Department of Justice Western Laboratory analyzed the pills sold by BENNER on September 27, 2022.  The results revealed a total of 980 pills weighing approximately 327 grams.  The pills tested positive for the presence of methamphetamine.



FIGURE 1: PICTURE OF SUSPECTED MDMA PILLS BENNER SOLD THE CHS ON SEPTEMBER 27, 2022.

***October 18, 2022 Controlled Buy of 2,000 MDMA Pills from BENNER (Supplied by J.S.)***

16.    On October 18, 2022, the CHS purchased approximately two thousand MDMA (methylenedioxymethamphetamine) pills from **BENNER** for $3,000.  Before the drug deal, **BENNER** communicated with the CHS using BENNER's Snapchat Account to coordinate the quantity of drugs, the

price, and the meeting location.  **BENNER** asked the CHS to meet him (**BENNER**) at BENNER's Former Residence.  **BENNER** told the CHS that his supplier would bring the drugs to BENNER's Former Residence, and that the price for two thousand MDMA pills was $3,000.  On this same day, the CHS met **BENNER** at this residence to purchase the drugs.

17.    FBI surveillance units observed **BENNER**'s supplier arrive at BENNER's Former Residence as the passenger of a silver Dodge truck.  A review of the DMV records for the silver Dodge truck revealed that the vehicle was registered to a J.S. residing in Fairfield. Based on the DMV records, the CHS reporting, and later confirmed by the surreptitious recording of the meeting, agents positively identified J.S. as one of **BENNER**'s suppliers.

18.    The CHS left BENNER's Former Residence under constant surveillance.  The CHS met with agents and task force officers after the controlled purchase operation at a predetermined location and turned over the package that J.S. had given the CHS.  The suspected drugs weighed approximately 687.3 grams in the original packaging.  The United States Department of Justice Western Laboratory analyzed the pills sold by J.S. and **BENNER** on October 18, 2022.  The results showed a total of 2,051 pills weighing approximately 661.1 grams.  The pills also tested positive for the presence of methamphetamine.



FIGURE 2: PICTURE OF SUSPECTED MDMA PILLS BENNER SOLD TO THE CHS ON OCTOBER 18, 2022.

***October 27, 2022 Controlled Buy of an AR-15 from J.S.  (Negotiated through BENNER)***

19.    On October 27, 2022, the CHS purchased an AR-15 from J.S.  This transaction was surveilled by law enforcement.  The deal was facilitated by **BENNER**, who communicated with the CHS using BENNER's Snapchat Account, to negotiate the price for the firearm and set up the time and meeting location with the CHS and J.S.  The CHS met with agents and task force officers after the controlled purchase operation and turned over the firearm that J.S. had sold the CHS.  The firearm was determined to be a 5.56/.223 caliber AR-15 style rifle.  This firearm did not have a serial number.

AFFIDAVIT

20.     The CHS stated that the person who sold him/her the rifle was J.S.  J.S. arrived alone, driving J.S.'s Dodge Ram.  The CHS stated when J.S. arrived, the CHS and **BENNER** went to the backseat of J.S.'s Dodge Ram.  **BENNER** retrieved the rifle from the floorboard and placed it on the backseat.  The CHS placed $1,500 on the driver seat of J.S.'s Dodge Ram, and then wrapped the rifle up before taking it back to his/her vehicle.  The CHS and **BENNER** sat in the CHS's vehicle and inspected the gun before returning to J.S.'s Dodge Ram.



FIGURE 3: FIREARM PURCHASED FROM BENNER AND J.S. ON OCTOBER 27, 2022

***Controlled Buy of 2000 MDMA Pills from BENNER (Supplied by J.S.) on December 7, 2022***

21.     On December 7, 2022, the CHS purchased 2,000 MDMA pills from **BENNER**.  The drugs were supplied by J.S.

22.     On December 6, 2022, **BENNER** communicated with the CHS using BENNER's Snapchat Account to coordinate the purchase of the pills and to set a location for the meeting.  On December 7, 2022, the CHS contacted **BENNER** again over BENNER's Snapchat Account to finalize the purchase of the MDMA and to set a time for the buy.  **BENNER** told the CHS to meet at BENNER's Former Residence at 3:00 p.m.  The negotiated price was $3,000.

23.     At about 3:00 p.m., the CHS arrived at BENNER's Former Residence and met with **BENNER** in person.  At approximately 3:37 p.m., **BENNER** could be heard talking with someone on a cellular phone.  **BENNER** relayed to the CHS that J.S. was picking up the MDMA from his "nephew." I confirmed that phone call was between BENNER's Phone and J.S. 's Phone.

24.     J.S. arrived at BENNER's Former Residence at approximately 4:30 p.m.  Upon his arrival I could hear the CHS, **BENNER**, and J.S. greet each other inside of BENNER's Former Residence.  I could hear the sound of a plastic bag rustling, and the CHS left moments later.

25.     Once the CHS left the meeting, he/she was kept under continuous surveillance.  The CHS

met with agents and task force officers after the controlled purchase operation and turned over the pills that J.S. had sold the CHS. The CHS stated J.S. handed the bag containing the pills directly to the CHS, and that **BENNER** looked at the contents of the bag during the transfer. The CHS handed the $3,000 directly to J.S.



FIGURE 4: PICTURE OF SUSPECTED MDMA PILLS J.S. SOLD TO THE CHS ON DECEMBER 7, 2022

26.    The United States Department of Justice Western Laboratory analyzed the pills sold by J.S. and **BENNER** on December 7, 2022. The results showed a total of 2,047 pills weighing approximately 711.2 grams. The pills also tested positive for the presence of methamphetamine.

27.    On January 17, 2023, the CHS reported that he/she had talked with **BENNER** on Instagram on or about January 15, 2023. **BENNER** reached out to the CHS from Instagram Account with the vanity name: "_its_jerm_" (**BENNER**'s Instagram Account) and informed the CHS that he (**BENNER**) had been attempting to contact J.S. for about a week with no success. **BENNER** was able to contact J.S.'s cousin (whom **BENNER** did not identify to the CHS), and the cousin informed **BENNER** that J.S. had died. The "cousin" did not specify how or where J.S. died. **BENNER** informed the CHS that he (**BENNER**) could still obtain drugs and guns, although **BENNER** did not identify his new source.

***February 13, 2023 Buy of 2,000 MDMA Pills from BENNER (Supplied by WARREN)***

28.    On February 13, 2023, the CHS purchased approximately two thousand MDMA (methylenedioxymethamphetamine) pills from **BENNER** for $3000.00. Prior to the buy, the CHS and **BENNER** coordinated the specifics of the transaction over Snapchat messages, including the time and meeting location, as well as the quantity and price of the narcotics.

29.    On February 13, the CHS met **BENNER** in the parking lot of a 7-Eleven located at 1610 Fairgrounds Drive, in Vallejo. Prior to the meeting, **BENNER** communicated with the CHS using **BENNER**'s Snapchat Account to coordinate the quantity of drugs, the price, and the meeting location. **BENNER** asked the CHS to meet him (**BENNER**) at the 7-Eleven. The CHS arrived at the meeting

location and parked at one of the 7-Eleven gas pumps. FBI surveillance units observed **BENNER** arriving at the 7-Eleven in a silver Lexus bearing the California License Plate 9ACJ925 (BENNER's Lexus) and parking at a gas pump facing the CHS' vehicle. Several minutes later, surveillance units observed a gray Honda, bearing the California License Plate 8RXZ319 ("**WARREN's Honda**") parking next to BENNER's Lexus on the opposite side of the gas pump.

30. The surreptitious recording captures **WARREN's Honda** arriving at the 7-Eleven and **BENNER** entering the front passenger door of **WARREN's Honda**. The recording also shows **BENNER** retrieving what appears to be a white plastic grocery bag from inside **WARREN's Honda** and giving it to the CHS. The recording later captures **BENNER** counting what appears to be U.S. currency. The CHS departed the 7-Eleven while **BENNER** remained inside **WARREN's Honda.**

31. The CHS left the meeting location in Vallejo under continuous surveillance. The CHS met with agents and task force officers after the controlled purchase operation at a predetermined location and turned over the package that **BENNER** had given the CHS. The suspected drugs weighed approximately 766.5 grams in their original packaging. The CHS described the supplier as a black male in his early 40s, standing between 5'9'' and 6'0'' tall, average build (later identified as ANTONIO WARREN). According to the CHS, the supplier had short hair, light facial hair, and was wearing a blue and white uniform from one of the local refineries. The supplier did not identify himself to the CHS and did not exit his vehicle. According to the CHS, the supplier gave **BENNER** the white grocery bag containing the suspected drugs, and **BENNER** handed the bag to the CHS. The CHS then gave **BENNER** $3,000 for the drugs and **BENNER** counted the money before giving the money to the supplier.

32. Shortly after the CHS departed the meeting location, surveillance units observed **BENNER** returning to his vehicle and both BENNER's Lexus and **WARREN's Honda** were observed departing the 7-Eleven. Surveillance units attempted to monitor the movements of **WARREN's Honda** but lost the vehicle in traffic. Later the same day, surveillance units found **WARREN's Honda** parked in front of 1926 Griffin Dr., Vallejo, CA (**WARREN's Residence**).

FIGURE 5: PICTURE OF SUSPECTED MDMA PILLS WARREN SOLD TO THE CHS ON FEBRUARY 13, 2023

33. On February 14, 2023, TFO Pittman conducted a CLETS registration check on **WARREN's HONDA** and found it was registered to N.P. at an address in Vallejo. TFO Pittman conducted a Vallejo Police Department location history check at that address and found ANTONIO MARKETH **WARREN**, DOB XX/XX/1972 provided this address in an online vandalism report in 2018. **WARREN** identified the address as his sister's house and stated his vehicle had been vandalized overnight while parked there.

34. TFO Pittman conducted an open-source database search of **WARREN** and found the top phone number associated to him was 510-260-9153 ("WARREN's Phone"). I compared that number to the Pen Register Trap and Trace data from BENNER's Phone and found **BENNER** called WARREN's Phone on February 13, 2023, around at 12:36 p.m. This date and time is about seven hours before the drug deal with the CHS, **BENNER**, and **WARREN** at the 7-Eleven in Vallejo. In particular, the drug deal occurred at about 7:43 p.m., and this toll connection between **BENNER** and **WARREN** is before the deal. In my experience, this call pattern is consistent with **BENNER** connecting with **WARREN** to make sure the drug deal would occur as planned. Additionally, this is consistent with the CHS's prior reporting that **WARREN** gets off of work around 7:30 p.m.

35. On February 14, 2023, TFO Pittman obtained a DMV photograph of **WARREN** and sent it to the CHS. The CHS positively identified **WARREN** as the supplier of the MDMA pills from February 13, 2023. Agents subsequently reviewed the surreptitious recording during the controlled buy conducted on February 13, 2023, and confirmed that the individual driving **WARREN's Honda** was **WARREN**.

36. The United States Department of Justice Western Laboratory analyzed the pills sold by **WARREN** and **BENNER** on February 13, 2023. The results showed a total of 1,929 pills weighing approximately 722.1 grams. The pills tested positive for the presence of methamphetamine. In addition to the pills, **WARREN** gave the CHS a plastic bag containing white powdery substance. The Western

AFFIDAVIT

10

Laboratory testing revealed the substance was Cocaine Hydrochloride with a net weight of approximately 3.4 grams and a purity level of approximately 92%.  Based on my training and experience, I know that drug dealers often supply their customers with samples of other drugs they are selling to potentially develop new customers and expand their networks.

37.    On March 8, 2023, FBI surveillance units observed **WARREN** arrive at **WARREN's RESIDENCE** driving **WARREN's Honda.**  Surveillance units observed **WARREN** exiting **WARREN's Honda** and accessing **WARREN's RESIDENCE** through a side gate.

***March 8, 2023 Controlled Buy of Ten Ounces of Cocaine from BENNER (Supplied by A.C.) and a Ruger Firearm***

38.    On March 6, 2023, **BENNER** told the CHS over Instagram messages that BENNER's Snapchat Account was discontinued by Snapchat. On March 8, 2023, the CHS purchased approximately ten ounces of cocaine from **BENNER** for $7,000.  **BENNER** used BENNER's Instagram Account to communicate with the CHS and coordinate the specifics of the transaction.

39.    On this same day, the CHS met **BENNER** at the Vallejo Municipal Marina located at 42 Harbor Way in Vallejo.  **BENNER** communicated the price, the meeting time, and the meeting location to the CHS over Instagram messages.

40.    At approximately 5:36 p.m., the CHS arrived at the meeting location and parked next to a blue Chevrolet Avalanche bearing the California License Plate 62509N3 (BENNER's Avalanche). **BENNER** was seated in the driver seat of BENNER's Avalanche.  I could hear the two engaged in conversation over the covert monitoring device.

41.    At about 5:49 p.m., the CHS asked **BENNER** when the cocaine was going to be delivered. **BENNER** then made a phone call and could be heard talking with someone.  I was monitoring the pen register data on BENNER's Phone and noted a call to 707-652-8504 ("A.C.'s Phone") while **BENNER** could be heard talking on the phone.

42.    At about 5:51 p.m., FBI surveillance units observed a white Jeep Wrangler ("A.C.'s Jeep") arrive and park next to BENNER and the CHS.  The driver of the vehicle contacted **BENNER** and a conversation between the three could be heard.  At about 5:53 p.m., A.C.'s Jeep left the parking lot.  FBI

surveillance units monitored the movement of A.C.'s Jeep believing that the cocaine deal had been completed.

43.     Surveillance units observed that the driver of A.C.'s Jeep was a light-complected Hispanic male in his 20's with medium length hair and a mustache (later identified as A.C.).  At about 6:00 p.m., A.C.'s Jeep was followed to Warren Avenue in Vallejo.  Surveillance units did not follow A.C.'s Jeep down the street because it is a lightly traveled street and the surveillance units could have been compromised.  At about 6:04 p.m., surveillance units observed A.C.'s Jeep parked in the driveway of a residence in Vallejo ("A.C.'s Residence").

44.     TFO Pittman conducted a DMV registration check of A.C.'s Jeep and found it was registered to A.C. and S.D. at A.C.'s Residence.  TFO Pittman obtained a DMV photograph of A.C. and identified him as the driver of A.C.'s Jeep.

45.     At this time, agents discontinued surveillance because they believed the deal had been completed.  The CHS contacted the agents and informed them the deal had not yet been completed, and they were waiting for a delivery of the cocaine.  The CHS remained with **BENNER**, in the parking lot of 42 Harbor Way, while awaiting the delivery.

46.     At approximately 6:33 p.m., surveillance units observed A.C.'s Jeep returning to the parking lot where the CHS and **BENNER** were parked.  The CHS got into the passenger's seat of A.C.'s Jeep.  The CHS, **BENNER**, and A.C. could be heard counting money.

47.     The CHS then left the meeting location under continuous surveillance.  The CHS provided officers and agents with the package containing the suspected cocaine.  The package consisted of a small brown carboard box which held two heat-sealed, clear plastic bags containing a white rocklike substance, suspected to be cocaine.  The United States Department of Justice Western Laboratory analyzed the suspected cocaine sold by **BENNER** and A.C. on March 8, 2023.  The Western Laboratory confirmed the substance was Cocaine Hydrochloride with a purity of approximately 89% and with a net weight of approximately 276.9 grams.

48.     The CHS stated that initially A.C. arrived and provided **BENNER** with approximately one ounce of cocaine.  The CHS showed A.C. the cash, and A.C. then left.  The CHS was unsure about what was happening, and asked **BENNER** if the supplier was returning.  **BENNER** informed the CHS the

AFFIDAVIT

12

supplier was going to get the cocaine and that the supplier had an uncle who was involved.

49.    When A.C. returned, he parked next to BENNER's Avalanche.  The CHS counted the money and handed it to **BENNER**.  **BENNER** verified the count, and A.C. handed the box to the CHS. The CHS left, while **BENNER** and A.C. remained at the meeting location.



FIGURE 6: COCAINE PURCHASED FROM BENNER AND A.C. ON MARCH 8, 2023

50.    Surveillance units conducted surveillance of A.C. as he left the meeting location and was followed into a business parking lot in Benicia.

***April 20, 2023 Controlled buy of 2,000 MDMA pills and a firearm from BENNER and WARREN***

51.    On April 20, 2023, the CHS purchased a firearm from **BENNER** for $800.  In addition, the CHS purchased approximately 2,000 MDMA pills from **WARREN** for $3,000.  Prior to the drug deal, **BENNER** messaged the CHS from BENNER's Instagram Account to coordinate the specifics of the transaction, including the time and meeting location, as well as the quantity and price for the firearm and the narcotics.

52.    On April 20, at about 7:05 p.m., the CHS met with **BENNER** at the 7-Eleven located at 1601 Fairgrounds Drive in Vallejo.  **BENNER** provided the CHS a Ruger LCP .380 caliber handgun (serial number 378-11154), two boxes of Armscor .380 ACP ammunition, three standard magazines for a Ruger LCP, and one extended magazine for a Ruger LCP.  The CHS handed **BENNER** $800 for the firearm and accessories.

53.    At about 7:13 p.m., I noted a phone call from BENNER's Phone to WARREN's Phone.  At about 7:19 p.m., FBI surveillance units observed **WARREN** exiting **WARREN's RESIDENCE**. **WARREN** entered the driver's seat of a silver Toyota Corolla bearing the California License Plate 8WOD012 **(WARREN's TOYOTA**), which was parked in front of the residence, and drove directly to

1601 Fairgrounds Drive.

54.    **WARREN** met with **BENNER** and the CHS in the parking lot.  The CHS handed **BENNER** $3,000 and **WARREN** handed the CHS two clear plastic bags containing the MDMA pills.  The CHS left the meeting location with the firearm from **BENNER** and the pills from **WARREN**.  **BENNER** remained behind inside of **WARREN's TOYOTA**.

55.    The CHS then left the meeting location under continuous surveillance.  The CHS provided officers and agents with the package containing the suspected MDMA, the firearm and the accessories.  The package consisted of two clear plastic bags containing multi-colored tablets, suspected to be MDMA.

56.    The United States Department of Justice Western Laboratory analyzed the pills sold by **WARREN** and **BENNER** on April 20, 2023.  The results showed a total of 1997 tablets weighing approximately 728.9 grams.  The pills tested positive for the presence of methamphetamine with a substance purity of approximately 7%.

57.    The CHS identified **WARREN** as the supplier of the MDMA pills based on the prior MDMA purchase on February 13, 2023.

58.    TFO Pittman conducted DMV records check on **WARREN's TOYOTA** and found it was registered to **WARREN** at 7544 Whisperwillow Drive, Sacramento.



FIGURE 7: MDMA PILLS AND FIREARM SUPPLIED BY BENNER AND WARREN ON APRIL 20, 2023.

### *April 28, 2023 Controlled buy of an AR-15 Rifle from BENNER*

59.    On April 28, 2023, the CHS purchased an AR-15 from **BENNER** for $1,600.  Prior to the buy, **BENNER** messaged the CHS from BENNER's Instagram Account to coordinate the specifics of the transaction to include price of the firearm, the time, and meeting location.

60.    On this same day, **BENNER** directed the CHS over Instagram messages to meet with him

AFFIDAVIT

14

(**BENNER**) at the O'Reilly Auto Parts located at 3100 Fruitridge Avenue in Sacramento.  When the CHS arrived at the O'Reilly Auto Parts store, **BENNER** was sitting in the driver seat of BENNER's Avalanche. **BENNER** directed the CHS to follow him (**BENNER**) to another location.  **BENNER** led the CHS to an address on 32nd Avenue in Sacramento.  **BENNER** parked in the driveway of the residence, and the CHS parked on the street.  **BENNER** led the CHS inside, where they contacted an unidentified Hispanic or Filipino male who appeared to be in his 30's.  This unidentified supplier handed the CHS a white and black AR-15 rifle with a detachable 30 round magazine.  The supplier also provided the CHS with approximately five rounds of .223/5.56 caliber ammunition.

61.     The CHS then left the meeting location under continuous surveillance.  The CHS provided officers and agents with the rifle and ammunition.  The rifle appeared to be functional, but it did not have a serial number.  The CHS stated he/she gave the money directly to the unidentified supplier, who then handed the rifle to the CHS.  **BENNER** remained behind at the residence when the CHS left.



FIGURE 8: FIREARM PURCHASED THROUGH BENNER ON APRIL 28, 2023.

62.     On May 28, 2023, **BENNER** contacted the CHS from BENNER's Instagram Account and offered to sell the CHS a Glock 19 pistol for $1500.  **BENNER** provided the CHS pictures of the firearm over Instagram messages.

63.     On June 4, 2023, **BENNER** contacted the CHS from BENNER's Instagram Account, offering to sell the CHS a fully automatic AR-15 pistol for $2,000.  **BENNER** sent the CHS the picture of this firearm below.  On June 14, 2023, **BENNER** agreed to sell the CHS the firearm, however the transaction was later canceled by **BENNER** who stated the supplier was not available at the time.

AFFIDAVIT

15

FIGURE 9: MACHINE GUN BENNER OFFERED TO SELL THE CHS ON JUNE 14, 2023.

### July 13, 2023 Controlled Buy of a Ruger LCR Revolver from BENNER

64.     On July 13, 2023, the CHS purchased a Ruger LCR revolver from **BENNER** for $650. Prior to the buy, **BENNER** messaged the CHS from BENNER's Instagram Account to coordinate the specifics of the transaction including the price of the firearm, the time, and meeting location. **BENNER** agreed to sell the CHS a Ruger LCR revolver for $650 and an AR-15 style rifle for $2000.

65.     On this same day, **BENNER** directed the CHS via Instagram messages to meet with him (BENNER) at the O'Reilly Auto Parts located at 3100 Fruitridge Avenue in Sacramento. **BENNER** arrived in the parking lot of the O'Reilly Auto Parts as a passenger in a silver Honda van. **BENNER** was accompanied by an unidentified Hispanic male who introduced himself to the CHS as "Chico." **BENNER** told the CHS that he (**BENNER**) would walk over to his residence to retrieve the revolver. Chico offered to give **BENNER** a ride, but **BENNER** declined stating that he could see his garage from their location. **BENNER** told the CHS that he moved in with Chico. **BENNER** walked through the parking lot of the O'Reilly Auto Parts towards 32nd Avenue and used a hole in the fence to access the back yard of a residence on the 32nd Avenue. The CHS reported that it appeared to be the same residence where **BENNER** asked the CHS to meet the supplier of an AR-15 during a previous controlled buy on April 28, 2023 (the residence on 32nd Avenue in Sacramento). The video recording shows **BENNER** returning to the buy location with a black satchel, taking something out of the satchel, and placing the item on the backseat of the CHS' vehicle. The CHS reported that **BENNER** placed the revolver and a box of ammunition on the backseat of the CHS' vehicle.

66.     The CHS paid **BENNER** $650 for the Ruger LCP revolver. **BENNER** told the CHS that the supplier of the AR-15 rifle was not available at that the time but might be available later in the evening or the following Tuesday. After the transaction was complete, **BENNER** and Chico departed the parking

AFFIDAVIT

16

lot of the O'Reilly Auto Parts store in the silver Honda. Surveillance units observed the Honda turn East on Fruitridge Road and then South on the 32nd Avenue. Surveillance units did not follow the Honda down the street because it is a lightly traveled street and the surveillance units could have been compromised. Several minutes later, surveillance units observed the Honda parked on the driveway of a residence in Sacramento.

67. The CHS left the meeting location under continuous surveillance. The CHS provided officers and agents with the firearm and the ammunition purchased from **BENNER**. Agents took custody of the firearm, a Ruger LCR 38 Special with serial number 545-81270. Records for the firearm revealed the gun was reported stolen to the Sacramento Police Department on July 19, 2019.



FIGURE 10: FIREARM SOLD BY BENNER TO THE CHS ON JULY 13, 2023

***August 9, 2023 Controlled Buy of 2,000 MDMA Pills from BENNER and WARREN***

68. On August 9, 2023, the CHS purchased approximately 2,000 MDMA pills from **BENNER** and **WARREN** for $3,000. Prior to the buy, **BENNER** messaged the CHS from BENNER's Instagram Account to coordinate the specifics of the transaction, to include the time and meeting location, as well as the quantity and price for the narcotics.

69. On August 9, 2023 at about 8:29 p.m., the CHS met with **BENNER** at the 7-Eleven located at 1601 Fairgrounds Drive, Vallejo. When the CHS arrived at the 7-Eleven, **BENNER** was already there in a white Lexus bearing the California License Plate 4UNW083 ("**BENNER's LEXUS**"). **BENNER** entered the CHS' vehicle and the CHS handed **BENNER** the $3000. The CHS reported that **BENNER** counted the money, put a rubber band around it, and placed it on the center console. According to the CHS, **BENNER** texted or messaged someone on his phone and, two to three minutes later, a silver Toyota Corolla arrived and parked in front of the CHS' vehicle. Surveillance units confirmed that the Corolla was **WARREN's TOYOTA**. **BENNER** took the money from the CHS, walked to **WARREN's**

**TOYOTA** and got into the passenger seat.  The CHS reported that s/he was able to see **BENNER** and the driver of **WARREN's TOYOTA** talking when the CHS decided to approach **WARREN's TOYOTA**.  **BENNER** then exited **WARREN's TOYOTA** and walked up to the CHS's vehicle.  **BENNER** placed a Walmart plastic bag containing the drugs on the CHS's driver seat.

70.     Before the meeting between the CHS and **BENNER**, FBI surveillance units had established surveillance in the vicinity of **WARREN's RESIDENCE**.  Surveillance units observed **WARREN's TOYOTA** parked on the street in front of **WARREN's RESIDENCE**.  At approximately 8:32 p.m., surveillance units observed a black male resembling **WARREN** walk from the gate of **WARREN's RESIDENCE** and enter **WARREN's TOYOTA**.  The vehicle then departed northbound on Griffin Drive towards the 7-Eleven.  At approximately 8:38 p.m., surveillance units observed the CHS and **BENNER** standing between the CHS's vehicle, **BENNER's LEXUS** and **WARREN's TOYOTA**.  After the transaction was complete **WARREN's TOYOTA** departed the 7-Eleven.  Surveillance units observed **BENNER** entering **BENNER's LEXUS** and departing the 7-Eleven.

71.     The CHS left the meeting location with the narcotics supplied by **BENNER** and **WARREN** under continuous surveillance.  The CHS provided officers and agents with the package containing the suspected MDMA pills.  The package consisted of two clear plastic bags containing multi-colored tablets of suspected MDMA pills.  While the suspected MDMA has not yet been tested, agents have subsequently visually inspected the drugs.  Based on their training and experience, agents have found the suspected MDMA to be consistent with the shape, size, and color of actual MDMA.  The approximate weight for the MDMA pills was 937.7 grams.

72.     The CHS identified **WARREN** as the supplier of the MDMA pills based on the prior MDMA purchases on February 13, 2023, and April 20, 2023.



FIGURE 11: MDMA PILLS SUPPLIED BY BENNER AND WARREN ON AUGUST 9, 2023

73.    During the meeting and communications leading up to the drug deal, **BENNER** told the CHS that he (**BENNER**) was moving to San Diego on or about August 11, 2023.  During the meeting, **BENNER** and the CHS discussed a future cocaine deal.  **BENNER** told the CHS that he (**BENNER**) would be willing to drive up from San Diego to facilitate the transaction if the deal was large enough. **BENNER** told the CHS that the price for one kilogram of cocaine would be $18,000 and the narcotics would be supplied to the CHS in Vallejo.

### *BENNER is a Prohibited Person under § 922(g)(1)*

A review of **BENNER's** criminal history reveals that he has been convicted of the following felonies:

1) 2005 felony conviction for grand theft, in violation of California Penal Code § 487(a);

2) 2005 felony conviction for possession of marijuana for sale, in violation of California Health and Safety Code § 11359;

3) 2008 felony conviction for possession of a narcotic controlled substance, in violation of California Health and Safety Code § 11350; and

4) 2008 felony conviction for possession of controlled substance, in violation of California Health and Safety Code § 11357(a).

### *Interstate Nexus*

Based on my training and experience, and my consultation with an ATF nexus expert, I know that Ruger firearms, such as the ones **BENNER** sold the CHS on April 20, 2023, and July 13, 2023, are not manufactured in the State of California.  Therefore, prior to **BENNER's** possession of these Ruger firearms, they must have travelled in interstate commerce.

### *Training and Experience Regarding Drug/Firearm Trafficking and Drug/Firearms Traffickers*

74.    As a result of my training and experience, I know that the traffickers who deal in controlled substances and firearms, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of the co-conspirators.  These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these

AFFIDAVIT

19

accounts and records in their residences and in the areas under their control.  It is my training and experience that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long term or on-going, equipment or records of the crime will be kept for some period of time.

75.    I have learned that large-scale drug and firearms traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of drug transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

76.    In my experience, drug traffickers commonly have in their possession, that is on their person, at their residence, and their vehicles, and in the areas under their control, firearms, included but not limited to handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons.  Such firearms are used by criminals to protect their illicit trafficking operations, and themselves against law enforcement and others because the illicit drug and firearms trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.

77.    In my experience, traffickers commonly have in their possession, that is on their person, at their residence, and in their vehicles, and in the areas under their control and which they have free and ready access to drugs and firearms, which they intend to distribute.  It is my experience that these traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

78.    In my experience, traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

79.    In my experience, drug traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized

AFFIDAVIT

20

in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

80.     In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities.  It has also been my experience that traffickers will also utilize the vehicles as locations in which to store controlled substances and guns prior to distribution.  During prior investigations, I have observed that traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

81.      In addition, drug and gun traffickers often tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing foreign bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" proceeds derived from the distribution of controlled substances.

82.     Individuals involved in the distribution of guns and drugs often make, or cause to be made, pictures videos, movies, compact discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their trafficking activities, and that such items often identify co-conspirators in their trafficking activities.

83.     It has been my experience in the past, and particularly in this case, that when suspects use mobile phones to communicate with cooperating individuals or undercover agents to set up their illegal transactions, records relating to these activities will be found stored in the cellular telephone.

84.     I know that traffickers use mobile phones to communicate with one another, either by voice or text message.  Mobile phones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the phone numbers of other traffickers and the dates and times that they and/or the mobile phone user dialed one another's telephones.  Mobile phones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a phone used by a trafficker is evidence of the association of the trafficker, some of which is related to his or her illegal business.  Mobile phones also have a voice mail function that allows caller to leave a message when the user does not answer.  Traffickers sometimes leave voice messages for each other, and this is evidence both of their mutual association and possibly their joint

AFFIDAVIT

21

criminal activity.  Mobile phones can also contain other user-entered data files such as to-do lists, which can provide evidence of crime when used by a trafficker.  Mobile phones can also contain photographic data files, which can be evidence of criminal activity when the user was a trafficker who took pictures of evidence of crime.

85.    As described in the Attachments A-1 through A-6, this affidavit seeks permission to search and seize things that are related to the drug/firearms-trafficking activities between BENNER, WARREN, A.C. and their co-conspirators and accomplices, in whatever form such things are stored.  Based on my training and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensic tools. Similarly, things that have been viewed via the Internet, are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

86.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in the respective Attachment B are items most often associated with the distribution of controlled substances as well as the proceeds from such illegal operations.

87.    Individuals involved in drug and gun trafficking also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all items listed in Attachment B to this affidavit and incorporated here by reference.

***Training and Experience Regarding Computers, Electronic Storage, And Forensic Analysis***

88.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

89.    Probable cause.  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

AFFIDAVIT

22

90.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

91.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

92.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

93.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

94.    Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

95.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of

AFFIDAVIT

23

information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

96.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files,

AFFIDAVIT

24

along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

97.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

98.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

99.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

100.    Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the

AFFIDAVIT

25

accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

101. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

102. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

103. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

104. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## IV.    REQUEST FOR SEALING

105. It is respectfully requested that this Court issue an order sealing, until further order of the

AFFIDAVIT

26

Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

AFFIDAVIT

27

## V.     CONCLUSION

106.     I submit that this affidavit supports probable cause for a warrant to search the TARGET SUBJECTS, PREMISES, and VEHICLES described in each respective Attachment A and seize the items described in each respective Attachment B.  Additionally, I submit that this affidavit supports probable cause for a complaint and arrest warrant against BENNER for a violation of 18.  U.S.C. § 922(g)(1).

Respectfully submitted,

/s/
Nathan Cernat
Special Agent
FBI

Subscribed and sworn to me via telephone on:     August 28, 2023

The Honorable Carolyn K. Delaney
UNITED STATES MAGISTRATE JUDGE

/s/ Adrian T. Kinsella
Approved as to form by AUSA ADRIAN T. KINSELLA

AFFIDAVIT
28

## United States v. JEREMY MICHAEL WARREN
### Penalties for Criminal Complaint

VIOLATION:          18 U.S.C. § 922(g)(1) - Felon in possession of firearm

PENALTIES:          Not more than 15 years months,
                    Not more than $250,000 fine or both
                    A three-year term of Supervised Release

SPECIAL ASSESSMENT: $100 (mandatory on each count)